39 F.3d 42
 UNITED STATES of America, Appellee,
v.
Vincent GIGANTE, also known as "Chin"; Vittorio Amuso, also
known as Jesse, also known as Vic; Anthony Casso, also
known as Gas, also known as Gaspipe; Peter Gotti; Dominic
Canterino, also known as Baldy Dom; Peter Chiodo; Joseph
Zito; Caesar Gurino; Vincent Ricciardo, also known as
Three Fingers; Joseph Marion, also known as Joe Cakes;
John Morrissey, also known as Sonny Blue, also known as
Sonny; Thomas McGowan; Victor Sobolewski; Anthony B.
Laino; Gerald Constabile; Andre Campanella; Michael
Realmuto; George Zappola; Richard Pagliarulo; Michael
DeSantis; Michael Spinelli; Thomas Carew; and Corrado
Marino, Defendants,
Venero Mangano, also known as Benny Eggs; Benedetto Aloi,
also known as Benny; and Dennis DeLucia,
Defendants-Appellants.
 Nos. 381 to 383, Dockets 93-1260, 93-1277 and 93-1278.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 25, 1993.
Decided Oct. 24, 1994.
 
 Gregory J. O'Connell, Asst. U.S. Atty. (Zachary Carter, U.S. Atty., and David C. James, Charles E. Rose, and Kevin P. McGrath, Asst. U.S. Attys., E.D.N.Y., of counsel), for appellee.
 Judd Burstein, New York City (Marc Fernich, New York City, of counsel), for defendant-appellant Aloi.
 Frederick P. Hafetz, Goldman & Hafetz, New York City (Susan R. Necheles and Adam Thurschwell, Goldman & Hafetz, New York City, of counsel), for defendant-appellant Mangano.
 Alan Futerfas, Shargel & Futerfas, New York City, for defendant-appellant DeLucia.
 Before: VAN GRAAFEILAND and WINTER, Circuit Judges, and POLLACK, District Judge.*
 WINTER, Circuit Judge:
 
 
 1
 Venero Mangano, Benedetto Aloi, and Dennis DeLucia appeal from their convictions by a jury before Judge Dearie for extortion and conspiracy to commit extortion in violation of 18 U.S.C. Secs. 2 and 1951. The principal issue on this appeal arises from the facts that Mangano and Aloi had, after conviction, a base offense level that would have resulted in sentences of 27-33 months under the Guidelines, whereas, after adjustments in the levels and upward departures, many of which were based on uncharged or acquitted conduct, Mangano was sentenced to 188 months, and Aloi to 200. In calculating Mangano's and Aloi's sentences, Judge Dearie granted the government's motion for an upward departure, pursuant to U.S.S.G. Sec. 5K2.0, from the sentencing range established in the United States Sentencing Guidelines on the basis of conduct for which Mangano and Aloi were not convicted. Mangano and Aloi appeal the upward departure as unreasonable, as based on other erroneous grounds, and as based on the wrong standard of proof. They further argue that the indictment underlying their convictions was legally improper and challenge their sentences for an improper calculation of the "amount demanded" by the extortion conspiracy. DeLucia, who was sentenced to 46 months, joins in his co-defendants' appeals of their convictions and presses his own argument that the evidence against him was legally insufficient and that his sentence was based on an erroneous calculation of the "amount demanded." We reject all these arguments and affirm.
 
 BACKGROUND
 
 2
 We view the evidence in the light most favorable to the government. Mangano and Aloi were senior members of the administration of the Genovese and Colombo crime organizations, respectively. Beginning in 1978, they participated in a lucrative conspiracy to control the window replacement market in the New York metropolitan area, primarily through controlling the bidding on contracts with the New York City Housing Authority ("NYCHA"). DeLucia, a senior or "made" member of the Colombo organization, joined the conspiracy in 1988. Through threats and acts of violence against window manufacturers, and through influence over a corrupt labor union, Local 580 of the Architectural and Ornamental Ironworkers Union ("Local 580"), responsible for supplying workers on window replacement contracts, Mangano, Aloi, DeLucia, and their associates managed to rig many of the bids on those contracts, thus inflating the costs to the NYCHA. They then collected payments from the manufacturers.
 
 
 3
 Mangano, Aloi, and DeLucia were convicted for the extortion of, and conspiring to extort, the window manufacturer Graham Architectural Products, Inc. ("Graham"). A manufacturer and supplier of windows to installers controlled by the conspirators, Graham attempted to bid for window installation contracts itself in 1982. Under direct threats from the conspirators and from Local 580 and other unions, Graham temporarily ceased to bid. In March 1985, Graham attempted yet again to submit competitive bids but was once more thwarted by the conspirators' threats and pressure on installers. Further attempts by Graham to escape the conspirators' control led it to seek new installers, only to discover that they too were controlled by organized crime families, including the Gambino organization.
 
 
 4
 The conspirators frequently quarreled over which crime family would garner the profits from control of Graham. Mangano stated at a 1988 meeting that, "I feel Graham was mine from the beginning." Nonetheless, all the conspirators agreed to exert control over Graham. For instance, at a meeting in June 1989, attended by all the major conspirators, the conspirators and Savino discussed their policy of thwarting Graham's efforts to bid independently.
 
 
 5
 The conspirators were clearly aware of the illegality of their actions. Both DeLucia and Aloi counseled their co-conspirators not to mention names, especially over the telephone. In discussing another co-conspirator, Mangano instructed Peter Savino, a government informant, to "[m]ake sure he ain't wired." Mangano warned the others to establish ostensibly legal rationalizations for their actions, "The rest has gotta be done [so] that when somebody comes with a microscope they gonna look at it, yous done everything legal and alright. No more of this fucking shit that you did over here." Aloi voiced his fear of apprehension, lamenting, "I don't want to go to jail for a hundred years." Finally, upon discovering that many of their incriminating conversations had been secretly recorded by Savino, one conspirator threatened Savino and told him, "You were seen with federal agents, rat mother-fucker."
 
 
 6
 Although a latecomer to the conspiracy, DeLucia was instrumental in its execution. DeLucia, an assistant to Aloi, appeared at almost every meeting attended by Aloi and demonstrated his knowledge of and complicity in the scheme. DeLucia thus revealed a grasp of the details of the conspiracy, including the arrangements for payments from the contractors and the planning of crucial meetings among the conspirators. DeLucia set the stage for the key discussion of the suppression of competitive bids through union intervention at the "heavyweights" meeting of February 24, 1989, when he stated, "The reason for this meeting is this guy's gotta throw in ... Sonny's gotta make this guy throw in back his bid so you wind up with it...."
 
 
 7
 The conspirators were indicted on sixty-nine counts of RICO violations and the underlying extortion, mail fraud, and labor payoff crimes. At trial, Savino, a former associate of the Genovese crime organization, testified extensively about the conspiracy and verified secretly recorded conversations amongst the conspirators that had taken place over eighteen months in 1988 and 1989. The government also introduced the testimony of Russell Trout, the former president of Graham, who recounted the pressure from the conspirators to cooperate with the conspiracy. Peter Chiodo, a former captain in the Luchese crime family, testified regarding the bidding conspiracy, the extortionate exclusion of competitors, and the collection of pay-offs from window manufacturers. Mangano, Aloi, DeLucia, and the crime families they represented, figured prominently in all of this testimony.
 
 
 8
 Mangano, Aloi, and DeLucia were convicted on Counts 3 (conspiracy to commit Hobbs Act extortion) and 59 (Hobbs Act extortion) of the 69-count indictment. The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right." 18 U.S.C. Sec. 1951(b)(2). Count 59 charged the defendants with acts of extortion, referenced in Racketeering Act 84, in obtaining from Graham with its consent and by the wrongful use of fear its property. This property consisted of its right to bid competitively and contract freely for window installation contracts. Racketeering Act 84 set out two acts of extortionate conduct:
 
 
 9
 a. The causing of window installation companies to refuse to contract for the installation of Graham windows in NYCHA projects; and
 
 
 10
 b. The causing of Graham, its owners, officers and employees to fear economic injury by threatening to prevent and preventing the installation of Graham windows in NYCHA projects.
 
 
 11
 At a Fatico sentencing hearing, see United States v. Fatico, 579 F.2d 707 (2d Cir.1978), the government presented evidence that Mangano and Aloi conspired to murder potential witnesses following the revelation in 1989 that Savino had secretly taped the conspirators' conversations for eighteen months. Peter Chiodo, a captain in the Luchese crime family, had testified at trial that he had murdered John "Sonny" Morrissey on orders from the conspirators. After his guilty plea, Chiodo himself became the victim of the murder conspiracy and was shot twelve times in an unsuccessful attempt on his life. At the Fatico hearing, the government also presented several other witnesses who testified that further murders had been planned but that those plans were suspended to increase the defendants' chances for release on bail.
 
 
 12
 At sentencing, the parties agreed that the applicable base offense level pursuant to U.S.S.G. Sec. 2B3.2 was eighteen. The district court then increased Mangano's and Aloi's sentences seven levels, pursuant to U.S.S.G. Sec. 2B3.1(b)(6)(h), based on the greater than five million dollar loss inflicted as the "amount demanded." The court further increased their sentences, pursuant to U.S.S.G. Sec. 3B1.1(a), based on the defendants' roles in the conspiracy, four levels for Mangano as a leader and three levels for Aloi as a "supervisor or manager." Finally, relying primarily on Mangano's and Aloi's participation in the murder conspiracy, the district court raised the offense levels by two for obstruction of justice pursuant to U.S.S.G. Sec. 3C1.1, resulting in an offense level of 31 for Mangano and 30 for Aloi. Pursuant to U.S.S.G. Sec. 5K2.0, the court granted an upward departure that corresponded to three levels in Mangano's case and five levels in Aloi's. Mangano received a sentence of 188 months, Aloi 200 months.
 
 
 13
 The district court increased DeLucia's offense level from the original 18 by three levels to 21, pursuant to U.S.S.G. Sec. 2B3.1(b)(6)(D), based on the "amount demanded" of $600,000, calculated as the difference between the rigged prices and competitive prices on a project re-bid after the indictment. This rendered a sentence of 46 months for DeLucia.
 
 DISCUSSION
 1. The Upward Adjustments and Departures
 
 14
 Mangano and Aloi argue that the district court erred in adjusting the base offense levels and departing substantially upward from the Guidelines' suggested sentencing range based on conduct for which they had not been convicted. To support this argument they invoke the Supreme Court's suggestion of undefined "constitutional limits" on the extent a State's sentencing framework may entail upward departures based on unconvicted conduct lest that become "the tail which wags the dog of the substantive offense." McMillan v. Pennsylvania, 477 U.S. 79, 86-88, 106 S.Ct. 2411, 2416, 91 L.Ed.2d 67 (1986). Mangano and Aloi rely upon our decision in United States v. Concepcion, 983 F.2d 369 (2d Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993), in challenging both the practice of departing upward based on uncharged or acquitted conduct, and the standard of proof used by the district court in assessing that conduct for sentencing.
 
 
 15
 Mangano and Aloi contend that the district court improperly required proof of the unconvicted conduct by a mere preponderance of the evidence rather than by clear and convincing evidence. They rely on a statement in a separate opinion in Concepcion that, "a strong argument can be made that the 'clear and convincing evidence' standard should be used, at least for substantial enhancements." Id. at 394 (Newman, J., concurring). They further echo Chief Judge Newman's request for a review of this issue by the full court of this circuit. Id. at 395-96 (Newman, J., dissenting from denial of rehearing in banc).
 
 
 16
 As noted in both the opinion of the court and Chief Judge Newman's opinion in Concepcion, proof of unconvicted conduct by a preponderance of the evidence is a sufficient threshold basis for an upward departure. Id. at 390, 394. Concepcion, however, did not rely upon the preponderance standard because the district court had established the relevant conduct by clear and convincing evidence. Id. at 390. In the instant matter, Judge Dearie stated that he had "concluded that the credible evidence before the Court, in a variety of forms and formats, has established by at least a preponderance of the evidence that defendants Mangano and Aloi were members of a conspiracy to murder witnesses...." Judge Dearie correctly understood the law of this circuit to be that unconvicted conduct may be relied upon to adjust a defendant's sentence level as contemplated by the Guidelines based on proof by a preponderance of the evidence. United States v. Rodriguez-Gonzalez, 899 F.2d 177, 182 (2d Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); United States v. Weinberg, 852 F.2d 681, 685 (2d Cir.1988).
 
 
 17
 In arguing that the extent of the departure was erroneous, Mangano and Aloi contrast the 27 to 33-month sentences indicated by the base offense level of 18 with Mangano's actual sentence of 188 months and Aloi's sentence of 200 months. They contend that this increase, based in part on acquitted conduct, violated their rights to due process under the Fifth Amendment.
 
 
 18
 Appellants' argument is not without force. The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses. See United States v. Fatico, 458 F.Supp. 388, 403 (E.D.N.Y.1978), aff'd, 603 F.2d 1053 (2d Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) ("Quantified, the preponderance standard would be 50+% probable."); see also Nissho-Iwai Co. v. M/T Stolt Lion, 719 F.2d 34, 38 (2d Cir.1983); Leonard B. Sand et al., Modern Federal Jury Instructions p 73.01 at 73-6 (1993). Appellants' constitutional argument is that such a low standard of proof should not serve as the basis for finding facts that then serve to increase sentences through adjustments or departures by substantial amounts, particularly when the conduct is uncharged or has previously resulted in an acquittal. They argue that a higher standard of proof, such as clear and convincing evidence, ought to apply.
 
 
 19
 Although we agree that there is a constitutional requirement of some rough proportionality between the weight of the evidence of the uncharged conduct and the degree of adjustment or departure--and believe the Guidelines so provide for reasons stated infra--we do not agree with appellants' solution. Certainly, the danger of factual error would permeate a substantial upward departure based on a finding of, say, six uncharged crimes, each of which was proven only by a bare preponderance. See Edwin Mansfield, Statistics for Business and Economics 102 (5th ed. 1994). The Guidelines are silent as to the requisite burden, however, and we have followed the pre-Guidelines Fatico decision that factual issues need be proven only by a preponderance. United States v. Guerra, 888 F.2d 247, 251 (2d Cir.1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). Of course, in the pre-Guidelines era, the extent of judicial discretion was such that the sentence might be ratcheted in a rough way upward or downward according to the weight of the evidence of uncharged or acquitted conduct. Indeed, a court had discretion to disregard such evidence entirely, even if proven. See Fatico, 579 F.2d at 713 n. 14. Under those circumstances, however, it was probably understood that the weight of the evidence of uncharged or acquitted conduct could be factored into the final sentence. A court thus also had the power to impose a very long sentence within the statutory maximum based on that uncharged conduct. United States v. Fischer, 381 F.2d 509, 511 (2d Cir.1967), cert. denied, 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185 (1968); United States v. Bowdach, 561 F.2d 1160, 1175 (5th Cir.1977); United States v. Hodges, 556 F.2d 366, 369 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978).
 
 
 20
 Courts have less discretion as to the range of sentences under the Guidelines. Moreover, in some situations it is mandatory under the Guidelines that they take uncharged conduct into account. See United States v. Telesco, 962 F.2d 165, 168 (2d Cir.1992); United States v. Vazzano, 906 F.2d 879, 882 (2d Cir.1990); U.S.S.G. Sec. 1B1.3, comment. (backg'd.). Nevertheless, we believe that the preponderance test continues to govern. United States v. Rivalta, 892 F.2d 223, 230 (2d Cir.1989). However, that test provides no more than a threshold basis for adjustments or departures, and we believe that the weight of the evidence is at some point a factor to be considered by a court with regard to both adjustments and upward departures.
 
 
 21
 With regard to adjustments, we believe that a district judge would be entitled to depart downward when faced with a situation in which a series of adjustments, each of which involves conduct proven by a bare preponderance, leading to substantial enhancement. The magnitude of the possibility of factual error increases as each adjustment is added to the base offense level. A district judge convinced that the weight of the factual record and ultimate sentence are substantially misaligned would be entitled to conclude that the Commission had not taken this into account and to depart downward. See United States v. Restrepo, 936 F.2d 661, 666 (2d Cir.1991); United States v. Cotto, 793 F.Supp. 64, 67 (E.D.N.Y.1992); United States v. Yellow Earrings, 891 F.2d 650, 654 (8th Cir.1989). We face no such situation in the instant matter, however. The adjustments for amount of loss, see infra, role in the offense, and obstruction of justice were based on overwhelming evidence.
 
 
 22
 With regard to upward departures, they must be reasonable. United States v. Stephenson, 921 F.2d 438, 441 (2d Cir.1990); United States v. Palta, 880 F.2d 636, 639 (2d Cir.1989). Indeed, defendants may appeal on the ground that a departure is unreasonable. 18 U.S.C. Sec. 3742(e)(3). We find it difficult to believe that a district judge who had to resort to a tie-breaking rule to find facts justifying an upward departure would actually depart in any substantial way. We also believe that an appellate court would and should take the weight of the evidence into account in reviewing the reasonableness of a departure.
 
 
 23
 The present case nicely illustrates the process. Judge Dearie began by stating that Mangano and Aloi had been shown by "at least a preponderance of the evidence" to have conspired to murder the witnesses. Noting that this was not a matter to be taken "lightly," Judge Dearie proceeded to analyze the testimony of the witnesses who implicated Mangano and Aloi in the conspiracy and why he found them credible. He then concluded, as do we, that the evidence was "compelling." Appellants' due process rights were thus not violated.[1]2. Validity of the Indictment
 
 
 24
 Mangano, Aloi, and DeLucia ask for a new trial on the ground that Count 59 failed to state properly the indicted offense of Hobbs Act extortion and that Count 3 charging conspiracy was therefore also invalid. The indictment charged that Graham had been extorted of its property right to contract freely with window installers with Graham's consent. The defendants contend that Graham could not have been extorted since, under the Hobbs Act, extortion requires the consent of the victim through force or fear. Under their theory, Graham had no need to consent to the deprivation of its right to contract freely since the defendants presented the company with a fait accompli. Rather than being extorted, they argue, Graham was merely robbed. See People v. Hagen, 212 A.D. 879, 208 N.Y.S. 235 (App.Div.1925) (holding that taking of money by physical force is not extortion). Moreover, they claim, even if Graham did fear harm, that fear did not prompt any action relevant for Hobbs Act purposes because Graham's consent was superfluous. Because the jury convicted on Count 59 on the basis of the allegedly defective "right to contract with installers" charge, appellants argue that the entire count must fail and be remanded for a new trial.
 
 
 25
 Even assuming that their legal arguments are correct, these arguments fail on factual grounds because "the causing of window installation companies to refuse to contract," is not the same as causing all installation companies to refuse to contract. The evidence at trial showed that some installers remained beyond the conspirators' control. So long as the possibility existed that Graham might contract with some other installer, the defendants' conduct, in causing some installers to refuse to contract with Graham, was an extortionate use of economic pressure aimed at causing Graham to cease its attempts at competitive bidding.
 
 
 26
 3. Sufficiency of the Evidence Against DeLucia
 
 
 27
 DeLucia argues that the government adduced insufficient evidence to support his conviction. The evidence must of course be viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and, if any rational jury could have found the essential elements of the crime, the conviction must be sustained. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Chang An-Lo, 851 F.2d 547, 554 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). DeLucia claims he was "extraordinarily ignorant" of the window installation conspiracy, pointing to several statements made during a key meeting of the conspirators on February 24, 1989. However, these statements, such as "I'm starting to learn all this now," and questions such as, "We're not the union ... that installs windows?" are ambiguous at best. They hardly amount to denials of involvement and are belied by DeLucia's own affirmative answer in responding to the question from a member of the Gambino crime family: "You know everything that's going on, right?" The record was thus sufficient to allow the jury to find that DeLucia was thus a "knowing participant" in the conspiracy. United States v. Young, 745 F.2d 733, 763 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).
 
 4. Amount of Loss
 
 28
 Mangano and Aloi challenge the calculation of the $5 million "amount demanded" on which basis the district court made a seven-level increase in their sentencing offense levels pursuant to U.S.S.G. Sec. 2B3.2(a). DeLucia challenges the same calculation on the basis of the $734,000 portion of that amount attributable to the period of his participation in the window installation conspiracy. The district court defined the "amount demanded" for sentencing purposes as the conspirators' "ill-gotten gains," calculated as roughly 10% of the amount of the conspirators' successful bids for NYCHA contracts. Judge Dearie based this figure on the difference between the withdrawn bid on the Unity Plaza project and the conspirators' rigged bid ($634,000) and on Trout's affidavit estimating the gross profits from NYCHA contracts.
 
 
 29
 Appellants claim that there was no "amount demanded" because there was no loss to Graham as the victim of the conspiracy, and that Graham in fact profited from its participation in the bid rigging. Appellants also assert that the evidence was insufficient to support the calculated amount. These arguments ignore that Graham was neither the sole "victim" nor the sole beneficiary of the conspiracy. The NYCHA lost millions of dollars by paying far higher than competitive prices for windows and their installation. That money did not just disappear. Although some went to Graham, most of the super-competitive portion went to the defendants.
 
 
 30
 Moreover, the evidence presented by the government was fully sufficient to sustain these calculations. The evidence before the court indicated that the average gross margin on an NYCHA contract was 10%. The court adopted this figure to determine the "amount demanded." For several reasons, this was an extremely conservative method to use to arrive at such an estimate. If 10% was the average margin for rigged and honest bids, the profits from the rigged bids would be higher. For the same reasons, DeLucia is properly responsible for the share of these amounts incurred during the period of his participation in the conspiracy.
 
 5. Miscellaneous
 
 31
 Defendants argue that the imposition of a seven-level enhancement violates the Ex Post Facto clause since U.S.S.G. Sec. 2B3.2(b)(1) (Nov.1988) only called for a six-level enhancement under the Guidelines in effect at the time of the offense. See United States v. Paccione, 949 F.2d 1183, 1204 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). This argument is without merit. The defendants' offense extended beyond November 1, 1989, because the indictment issued on May 30, 1990. They were therefore properly sentenced under the November 1, 1989 Guidelines Section 2B3.1(b)(6)(H) specifying a seven-level increase. United States v. Eisen, 974 F.2d 246, 268 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993) (conspirators correctly sentenced under November 1, 1987 Guidelines because conspiracy foreseeably extended beyond November 1, 1987).
 
 
 32
 The reference to U.S.S.G. Sec. 2B3.2(b)(4)(C) of the extortion guidelines which specifies a six-level increase for victims sustaining bodily injury was not improper as a basis for calculating the extent of the departure. Judge Dearie referred to the "threatening undertone of some level of violence" throughout the conspiracy and to the murders that were planned and committed in the wake of its exposure. Although a district court must explain the grounds for the departure, it need not articulate the precise provision relied on as a referent for the extent of the departure. United States v. Cervantes, 878 F.2d 50, 54 (2d Cir.1989) ("[W]e do not require sentencing judges to 'incant the specific language' used in the Guidelines.") (quoting United States v. De Luna-Trujillo, 868 F.2d 122, 124 (5th Cir.1989)).[2]
 
 
 33
 We therefore affirm.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 34
 To prove extortion under the Hobbs Act, the Government must prove that the defendant obtained "property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear...." 18 U.S.C. Sec. 1951(b)(2). In the instant case, the district court, reading directly from the indictment, instructed the jury that the "extortionate conduct" charged against the defendants included "the causing of window installation companies to refuse to contract for the installation of Graham windows in New York City Housing Authority projects." Whatever it may be, this conduct was not extortion.
 
 
 35
 I therefore dissent. A general guilty verdict must be overturned if one of the possible bases for conviction is legally, as contrasted with factually, insufficient. United States v. Garcia, 992 F.2d 409, 416 (2d Cir.1993).
 
 
 
 *
 The Honorable Milton Pollack, District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Mangano and Aloi contend that Judge Dearie erroneously included a "confluence of circumstances" involving organized criminal activity as an alternative basis for the upward departure from the Guidelines' recommended sentencing range. Judge Dearie mentioned the defendants' "status within their respective organizations, and their status within the bid rigging conspiracy, as opposed to the mere fact that they are members of organized crime groups," as well as the duration and extent of the conspiracy as factors constituting this "confluence." Mangano and Aloi argue that the Sentencing Commission already adequately considered these factors in calculating the Guidelines's ranges, that this departure impermissibly double counted factors taken into account in the three-level "role" adjustment, and that the court improperly calculated the extent of the departure based on U.S.S.G. Sec. 2B3.2(b)(4)(C)
 These arguments are meritless. Judge Dearie relied primarily on Mangano's and Aloi's participation in the murder conspiracy, "itself a valid basis, indeed a compelling basis, to depart upwardly." Judge Dearie explicitly ruled out departure solely on the basis of organized criminal activity, stating "I know of no authority ... to enhance or increase or even upwardly depart on the sole basis of membership in an organized criminal activity." Instead, he pointed to Mangano's and Aloi's status within their respective crime families and within the conspiracy, in addition to the breadth and duration of the conspiracy, to justify an upward departure. These criteria do not "double count" the defendants' "leadership role" in the conspiracy since Judge Dearie could in any case depart upward from that calculation because leadership in the conspiracy is not the same as leadership in organized crime. Moreover, the Guidelines explicitly authorize upward departure on the basis of organized criminal activity. U.S.S.G. Sec. 2B3.2, comment. (n. 8).
 
 
 [2]
 We do not consider Mangano's and Aloi's arguments based on the Supreme Court's decision in Williams v. United States, --- U.S. ----, ----, 112 S.Ct. 1112, 1122, 117 L.Ed.2d 341 (1992). These arguments were raised for the first time in the defendants' reply brief. Arguments may not be made for the first time in a reply brief. N.L.R.B. v. Star Color Plate Serv., 843 F.2d 1507, 1510 n. 3 (2d Cir.) (rejecting attempt to raise new issue in reply brief even though issue was raised in previous proceeding), cert. denied, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988); see also Bendix Autolite Corp. v. Midwesco Enters., 486 U.S. 888, 895, 108 S.Ct. 2218, 2222-23, 100 L.Ed.2d 896 (1988) (refusing to evaluate an argument appellate court refused to consider because first raised in reply brief); Lee v. Burkhart, 991 F.2d 1004, 1010 n. 4 (2d Cir.1993) (declining to consider plaintiff's allegation raised for first time in reply brief)