157 F.3d 949
 UNITED STATES of America, Appellee,
v.
Jose REYES, also known as El Feo, also known as Moncheche,
also known as Jay, also known as Jose Rodriguez,
Defendant-Appellant,
Francisco Medina, also known as Freddy, also known as Miguel
Perez, also known as Raul Polanco, and Thomas
Rodriguez, also known as Cruel, Defendants.
 No. 411, Docket 97-1072.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 6, 1998.
Decided Oct. 15, 1998.
 
 Joseph A. Bondy, New York City, for Defendant-Appellant.
 Thomas A. Arena, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for Southern District of New York, Bruce G. Ohr, Elizabeth Glazer, Assistant United States Attorneys, on brief), for Appellee.
 Before: KEARSE and JACOBS, Circuit Judges, and MISHLER,* District Judge.
 JACOBS, Circuit Judge:
 
 
 1
 Defendant Jose Reyes appeals from a final judgment of the United States District Court for the Southern District of New York (Scheindlin, J.) convicting him, following a jury trial, of a variety of racketeering and narcotics offenses, and conspiracy to murder. At trial, a key government witness testified that, during visits the witness made to Reyes in prison, Reyes gave him instructions to commit certain murders, and that he later carried out those instructions. On appeal, Reyes argues that the district court erred in permitting the government to introduce a logbook of prison visitors to corroborate the visits and the visiting dates (which correlate with some of the murders). We conclude that the logbook was admissible as a business record under Fed.R.Evid. 803(6), and therefore affirm. Reyes also challenges the judgment on the ground that the testimony of the cooperating witness was procured as a result of the illegal seizure of a hand-held computer, that the evidence of conspiracy to murder one Ronnie Gedders was insufficient to support the verdict, and that the government in summation referred to a map not received in evidence. None of these arguments has merit.
 
 BACKGROUND
 
 2
 In February 1996, Jose Reyes and several co-defendants were charged in a 58-count indictment that alleged, inter alia, that Reyes and his co-defendants were members of a criminal organization that engaged in narcotics trafficking, murder, assault, and other acts of violence. Reyes himself was charged in 43 counts that included racketeering violations, multiple counts of murder and conspiracy to commit murder, conspiracy to distribute narcotics, and firearms violations. The district court ruled on numerous suppression motions, and the case proceeded to trial by jury.
 
 
 3
 The trial evidence showed that Reyes was the head of a large drug distribution organization that sold vast amounts of heroin and crack cocaine in street-level quantities from spots in Manhattan and the Bronx. To protect these operations, Reyes and his subordinates engaged in many acts of murder, attempted murder, and assault against competitors, rival groups, and traitors to the organization. Much of this evidence came from a cooperating witness, Raul Vargas ("Vargas"), who described the scope of Reyes's drug distribution activities, and Vargas's work as a hit man for Reyes.
 
 
 4
 Among many other things, Vargas testified that he visited Reyes "[a]bout three times" in prison at Cape Vincent Correctional Facility in upstate New York (where Reyes was serving a state sentence for third degree possession of a weapon), that they discussed the organization during the visits, and that Reyes gave Vargas orders on whom to kill.
 
 
 5
 To corroborate Vargas's testimony concerning his visits to Reyes in prison, and Reyes's continued role in the drug organization during his incarceration at Cape Vincent, the government offered in evidence the visitor logbook from Cape Vincent. Logbook entries indicated that Vargas and other gang members visited Reyes on several occasions, including visits on days close in time to several murders. Reyes argues that if the logbook had been excluded, there would have been no corroboration of Vargas's testimony that several killings were ordered by Reyes during the visits to Cape Vincent.
 
 
 6
 Before admitting the logbook into evidence, the district court heard testimony outside the presence of the jury from Susan McLear, the Inmate Records Coordinator at Cape Vincent, who was responsible for maintaining and storing prison visitor logbooks, and who testified on the basis of what she observed when people came to see her at the prison. The procedure, according to McLear, is that visitors are required to show identification to the lobby officer and to sign their names and record their addresses in the logbook, and that the lobby officer is required to check the visitor's identification against the entry in the book. McLear, who had been employed by the Department of Corrections for eight years, testified that this was "normal procedure at a correctional facility."
 
 
 7
 After hearing McLear's testimony, the district court concluded:
 
 
 8
 [A]lthough the person who gave the information is not an employee ... the log is kept in the regular course of business and it seems that from the testimony of this witness there is enough to conclude that the log is kept under a duty of accuracy and that the entity, that is, the institution, relies on it and that every visitor must produce identification, must sign in prior to be admitted to the institution, and for all of those reasons it appears to be ... a business record.
 
 
 9
 Over the objection of Reyes's counsel, the district court admitted the logbook under the business records exception to the hearsay rule, Fed.R.Evid. 803(6).
 
 
 10
 The jury convicted Reyes of one count of participating in racketeering activities, one count of conspiracy to participate in racketeering activities, one count of conspiracy to violate the federal narcotics laws, one count of engaging in a continuing criminal enterprise, and seven counts of conspiracy to commit murder. The district court sentenced him to life imprisonment, followed by five years of supervised release, and a $600 special assessment.
 
 DISCUSSION
 A. Prison Logbook
 
 11
 Reyes challenges the admission of the prison visitor logbook on the ground that it is hearsay outside the scope of any exception.
 
 
 12
 Hearsay is an out-of-court statement offered into evidence for the truth of the matter asserted. See Fed.R.Evid. 801(c). In this case, the hearsay consists of written self-identifications made by individuals visiting the prison, offered by the government to prove that those individuals had in fact visited the facility on particular dates.
 
 
 13
 The hearsay exception cited by the district court is Rule 803(6), which covers
 
 
 14
 [a] memorandum, report, record, or data compilation ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 
 
 15
 Fed.R.Evid. 803(6).
 
 
 16
 A district court's admission of evidence under Rule 803(6), commonly known as the business records exception, is reviewed for abuse of discretion. See Phoenix Assocs. III v. Stone, 60 F.3d 95, 100 (2d Cir.1995).
 
 
 17
 Reyes makes three arguments that the district court erred in admitting the prison visitor logbook under Rule 803(6). Each argument fails.
 
 
 18
 1. The Testimony of the Records Custodian.
 
 
 19
 Reyes's first argument is that the Records Custodian, McLear, was incapable of establishing the reliability of the logbook because she lacked "direct, firsthand knowledge" about how the logbook was prepared and as to "what measures were taken to assure its accuracy."
 
 
 20
 McLear testified that her knowledge of the sign-in procedure came from, inter alia, having observed her visitors sign the logbook. She also testified that she "observed them filling out their name, showing their identification and putting in the purpose that they are there." McLear admitted that she lacked personal knowledge of "whether the lobby officer checks each entry in the log against the identification which has been shown to him," but she did testify that it "is a procedure they usually have to follow." (Emphasis added.)
 
 
 21
 McLear's knowledge of the procedure used by the lobby officers--based, as it is, upon eight years of employment with the Department of Corrections--is sufficient for the purposes of Rule 803(6). If knowledge were required as to each particular entry in a record, document "custodians" could rarely satisfy the requirements of Rule 803(6). This Circuit has recognized that a custodian who testifies as to the authenticity of a record need not have firsthand knowledge of the creation of the record. See United States v. Jakobetz, 955 F.2d 786, 801 (2d Cir.1992); see also Saks Int'l, Inc. v. M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir.1987) ("[T]here is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person."); 4 Jack B. Weinstein et al., Weinstein's Evidence p 803(6).
 
 
 22
 2. Duty to Provide Information.
 
 
 23
 Reyes's second claim is that the business records exception is inapplicable because prison visitors who write their names in the logbook have no business duty to provide the information. The requirement of a business duty is not in the language of Rule 803(6), but it has long been recognized as the principal means of establishing the reliability of a hearsay statement offered under the rule. See United States v. Lieberman, 637 F.2d 95, 100 (2d Cir.1980) (citing McCormick's Handbook of the Law of Evidence 727 (2d ed.1972)). As Reyes argues, the rule is that the individual with the business duty and the hearsay declarant should be the same person, but this and other circuits have recognized an exception to the general rule: The person making the record need not have a duty to report so long as someone has a duty to verify the information reported. Tellingly, nearly all of these cases involve reporting arrangements that resemble the sign-in for the Cape Vincent logbook in certain critical respects: Customers or other non-employees provide their names and (sometimes) their addresses to entities that demand ID verification as a regular practice of their business. So long as the regular practice of verification is established, the cases allow the names into evidence under the business records exception.
 
 
 24
 In United States v. Lieberman, 637 F.2d at 101, we considered the admissibility of a hotel guest card filled in by the guest, explaining that the business records exception does not "depend[ ] on ... whether the guest supplies the information by writing it on a card, or by stating it so that it may be written on the card by the employee." The exception is available if "the employee were able in some way to verify the information provided--for example, by examining a credit card, driver's license or other form of identification." Id. The Court concluded that "if such verification is obtained by the employee, we see no reason why the guest card that has been filled in by the guest himself would not qualify as a business record...." Id.
 
 
 25
 Decisions from six other circuits apply the business records exception where an employee of the business has a duty to verify the information, even where the third party providing the information has no duty to report it. See United States v. Console, 13 F.3d 641, 657-58 (3d Cir.1993); United States v. McIntyre, 997 F.2d 687, 700 (10th Cir.1993) ("If the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person, the exception may still apply."); United States v. Bland, 961 F.2d 123, 127 (9th Cir.1992) (customer's name on firearm purchase record admissible when gun store employees were required to verify name with photo identification); United States v. Patrick, 959 F.2d 991, 1001 (D.C.Cir.1992) ("[I]n deciding whether the receipt was properly admitted, we do not require that [the customer] be under a business duty to provide the information. Rather, it is sufficient if it is shown that [the merchant's] standard practice was to verify the information provided by a customer."); United States v. Zapata, 871 F.2d 616, 625 (7th Cir.1989); United States v. Pearson, 508 F.2d 595, 597 (5th Cir.1975); see also 31 Michael H. Graham, Federal Practice and Procedure: Evidence § 6757, at 372 n. 29 (Interim Edition 1997).
 
 
 26
 The district court found that McLear's testimony was sufficient to show that the logbook was kept under a duty of accuracy, because "every visitor must produce identification" and "the officer or employee on duty checks the identification." It was not an abuse of discretion to conclude that these findings reflect a duty of accuracy sufficient to support admission of the logbook as a business record.
 
 
 27
 3. Trustworthiness.
 
 
 28
 Finally, Reyes invokes the provision of Rule 803(6) that requires the exclusion of evidence that otherwise meets the requirements for the business record exception if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). Reyes argues that the logbook was not trustworthy because (i) it reflects irregularities, such as missing names, missing addresses, different names in the same handwriting, etc.; and (ii) it is untrustworthy as a whole because prison visitors, who must realize that the logbook is or can be used to monitor contacts with inmates, have an incentive to provide misinformation.
 
 
 29
 Reyes succeeds in raising questions of trustworthiness, but he fails to show that the district court abused its discretion in finding that the logbook was sufficiently trustworthy to be admitted under Rule 803(6). Susan McLear's testimony about verification procedures provided an adequate basis for the district court to find that the logbook was trustworthy, despite Reyes's objections concerning irregularities. This testimony also would have furnished a basis for the district court to reject the argument--had it been made during the hearing--that the logbook was untrustworthy because some visitors could have falsified their entries. Indeed, the district court evidently did infer that such falsification is deterred by having lobby officers check entries against identifications. Residual doubts on the question would go to the weight of the evidence, not its admissibility. See Graham C. Lilly, An Introduction to the Law of Evidence § 7.17, at 306-07 (3d ed.1996).
 
 B. Other Claims
 
 30
 Reyes raises three other claims, all of which we reject.
 
 1. Vargas Testimony
 
 31
 Reyes argues that the trial court should have excluded the testimony of Vargas, a cooperating witness. Vargas testified extensively about Reyes's leadership of the drug organization, including his role in numerous murders and attempted murders.
 
 
 32
 The facts surrounding how the government located Vargas are important to Reyes's claim. When agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") arrested Reyes on December 2, 1994, they seized a Sharp "Wizard" handheld computer that he was carrying in a bag. After obtaining a warrant to search the computer's memory, ATF agent Laurie Horne ("Horne") retrieved from it a telephone number for an individual identified as "Rugi." The ATF learned that the subscriber of this telephone number was one "Matthew Commeau" at an address in Lynn, Massachusetts. ATF agents subsequently traveled to Massachusetts and arrested Raul Vargas at that address.
 
 
 33
 The district court granted Reyes's pretrial motion to suppress the evidence from the Sharp computer on the ground that the search warrant was invalid. See United States v. Reyes, 922 F.Supp. 818, 825-31 (S.D.N.Y.1996). Reyes then sought a hearing to find out whether the government derived any evidence from the search of the computer's memory. In response to this second motion, the government submitted the affidavit of Agent Horne, stating that the only investigative use of the Sharp computer was to obtain the telephone number "for an individual named 'Rugi.' " Agent Horne added that, prior to the seizure of the computer, she (1) knew of the existence of a close associate of Reyes named "Raul," (2) was aware that Raul used the alias "Rugi," and (3) knew that, incident to the arrest of one of Reyes's co-conspirators, ATF had seized a piece of paper that contained a (different) Massachusetts telephone number for one "Raul."
 
 
 34
 On appeal, Reyes argues that the district court should have excluded the testimony of Raul Vargas because he was located as a result of the illegal search of the handheld computer, citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (describing "fruit of the poisonous tree" doctrine). Because Reyes failed to object to the admission of Vargas's testimony before or during trial, we review this claim for plain error.[1] United States v. Yu-Leung, 51 F.3d 1116, 1120-21 (2d Cir.1995) (citing Fed.R.Evid. 103(a)(1)). We find none.
 
 
 35
 In United States v. Ceccolini, 435 U.S. 268, 275-79, 98 S.Ct. 1054, 1060-62, 55 L.Ed.2d 268 (1978), the Supreme Court held that the exclusionary rule does not invariably bar the testimony of a witness whose identity is revealed to the authorities as the result of an illegal search. The exclusion of such testimony depends on the degree of attenuation between the illegal search and the testimony. In analyzing attenuation in that case, the Court weighed a number of factors, including (1) that "the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority," (2) that "[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness ... and between the latter and the testimony at trial," and (3) that the identity of the witness and her relationship with the defendant "were well known to those investigating the case." Id. at 279, 98 S.Ct. at 1062. The Court concluded that "[a]pplication of the exclusionary rule in this situation could not have the slightest deterrent effect." Id. at 280, 98 S.Ct. at 1062.
 
 
 36
 In United States v. Leonardi, 623 F.2d 746 (2d Cir.1980), this Court interpreted Ceccolini to require consideration of the following factors: (a) "the stated willingness of the witness to testify," (b) "the role played by the illegally seized evidence in gaining his cooperation," (c) "the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial," and (d) "the [motivation of the police] in conducting the search." Id. at 752.
 
 
 37
 In this case, the government used the illegally seized telephone number to locate Vargas, but there was nonetheless sufficient attenuation between the illegal search and Vargas's testimony to purge the taint. At a suppression hearing (regarding other evidence in this case), Vargas testified that he did not even consider cooperating with the government until February 1995, when he was being held pending a bail hearing and encountered a prisoner who explained to him the advantages of cooperating. Vargas explained at the hearing, "I was trying to keep it real, somebody flipped on me, I had no choice but to flip and help myself." Several days after the talk with the fellow inmate, Reyes and his lawyer met with Agent Horne and AUSA Tom Clark. As Vargas further testified, he told them "I regretted what I had done and I wanted to do the right thing for me and my family, and that I wanted to clear my conscience."
 
 
 38
 This testimony supports the conclusion that Vargas's cooperation was "truly the product of [his] free will, unaffected by the illicit search," id. at 752, and that Vargas's trial testimony was the "product of detached reflection and a desire to be cooperative." Id. at 753 (quoting Ceccolini, 435 U.S. at 277, 98 S.Ct. at 1060). In light of (1) Vargas's stated willingness to testify, (2) the relatively insignificant role played by the illegally seized evidence in actually gaining his cooperation, and (3) the two-and-a-half-month lapse between the illegal behavior and Vargas's decision to cooperate, the connection between the illegal search and the testimony is sufficiently attenuated. So, even though Vargas was tracked down with the aid of the illegally seized telephone number and even if the agents would not have located him by means of their preexisting knowledge of the existence of "Rugi," it was not plain error for the district court to permit him to testify.
 
 
 39
 2. Sufficiency of the Evidence for Conspiracy to Murder Ronnie Gedders
 
 
 40
 Reyes argues that the evidence was insufficient to sustain his conviction for the conspiracy to murder Ronnie Gedders because the conviction "was based solely on the uncorroborated testimony of Raul Vargas," which (he argues) was "simply insufficient for the jury to have satisfied every element required for it to return a guilty verdict."
 
 
 41
 When reviewing a conviction for an alleged insufficiency of evidence, this Court will view the evidence "in the light most favorable to the government, and constru[e] all permissible inferences in its favor," United States v. Puzzo, 928 F.2d 1356, 1357 (2d Cir.1991), "resolve all issues of credibility[ ] in favor of the jury's verdict," United States v. Weiss, 930 F.2d 185, 191 (2d Cir.1991) (quoting United States v. Tyler, 758 F.2d 66, 68 (2d Cir.1985)) (internal quotation marks omitted), and "uphold a conviction if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt," United States v. Brown, 937 F.2d 32, 35 (2d Cir.1991).
 
 
 42
 Reyes was convicted for conspiring to murder Ronnie Gedders under 18 U.S.C. § 1959(a)(5), which provides that "[w]hosoever ... for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... or conspires to do so, shall be punished." Thus, to convict Reyes on this count, the jury must have found beyond a reasonable doubt that Reyes (1) conspired to murder Gedders, and (2) did so for the purpose of maintaining his drug business.
 
 
 43
 Vargas's testimony was sufficient to sustain Reyes's conviction because it gave the jury a basis to find each of the required elements beyond a reasonable doubt. During the trial, Vargas explained that Reyes had a customer named Willie Jones, who would buy powder cocaine from Reyes, cook it, and sell it as crack at a spot on Arlington Avenue; that Gedders was encroaching on Jones' spot; and that Jones asked Reyes to "take care of the problem." Vargas recounted how Reyes ordered the murder of Gedders; how Vargas, Reyes and co-defendant Frank Medina drove around looking for Gedders; and how, when they found him, Reyes instructed Vargas to get out of the car and shoot Gedders. Vargas then described how he walked up to Gedders, fired 15 rounds into him, saw him fall, and ran back to the car. New York Police Officer Charles James (one of the two officers who were first on the scene) provided some corroboration for Vargas's account: He saw spent shells on the ground and vouchered 15 spent shells. There was sufficient evidence for the jury to convict.
 
 
 44
 3. Use of New York State Map During Summation
 
 
 45
 Finally, Reyes argues that the district court erred by permitting the government to refer the jury to a blown-up map of New York State during its summation. The government used the map to show the distances that gang members traveled to visit Reyes when he was in prison at Cape Vincent. Reyes contends that this was error because "[t]he map was not in evidence, yet it was enlarged to a size that made an inescapable impact upon the jurors." There is no case in this Circuit that is directly on point, but the Eighth Circuit has held that in closing arguments, "[t]he use of summary charts, diagrams, and other visual aids is generally permissible in the sound discretion of the trial court" and such aids "need not be admitted into evidence." United States v. Crockett, 49 F.3d 1357, 1360-61 (8th Cir.1995). We need no such broad rule to decide this case, in which the district court permitted the prosecution to use a map of the state as "an aid in summation." This was not an abuse of discretion.Conclusion
 
 
 46
 The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Jacob Mishler, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Reyes filed an omnibus pretrial motion that, inter alia, requested a hearing to determine whether the government derived any evidence from the illegal search of the Sharp computer. Even if we construe this as a motion in limine, there would still be no preservation here because the district court never "ruled upon [the motion] without equivocation," a necessary precondition if a motion in limine is relied upon to preserve an evidentiary objection. United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir.1995)