UNITED STATES of America, Appellee–Cross–Appellant,

v.

SKW METALS & ALLOYS, INC.; and Charles Zak, Defendants–Appellants–Cross–Appellees.

Nos. 547, 569, 703, Dockets 98–1090, 98–1091, 98–1139.

United States Court of Appeals, Second Circuit.

Argued: Oct. 22, 1998

Decided: Oct. 28, 1999

84

Andrea Limmer, Washington, DC (Joel I. Klein, Assistant Attorney General, A. Douglas Melamed, Deputy Assistant Attorney General, John J. Powers, III, Department of Justice, Washington, DC; Melvin Lublinski, Edward Friedman, John W. McReynolds, Department of Justice, New York, NY, on the brief), for Appellee–Cross–Appellant United States.

Kevin M. Kearney, Buffalo, N.Y. (Victor T. Fuzak, Leecia Roberta Eve, Hodgson, Russ, Andrews, Woods & Goodyear, LLP, on the brief), for Defendant–Appellee–Cross–Appellant Charles Zak.

George R. Kucik, Washington, DC (Nada S. Sulaiman, Arent Fox Kintner Plotkin & Kahn, PLLC, on the brief), for Defendant–Appellee–Cross–Appellant SKW Metals & Alloys, Inc.

Before: NEWMAN and JACOBS, Circuit Judges and TSOUCALAS, Judge.[1]

Judge JON O. NEWMAN concurs in part by a separate opinion.

JACOBS, Circuit Judge:

SKW Metals & Alloys, Inc. ("SKW") and its executive vice-president, Charles Zak, were convicted, after a jury trial in the United States District Court for the Western District of New York (Skretny, *J.*), of conspiracy to fix prices in the market for ferrosilicon, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1990). SKW was fined $150,000; Zak was fined $30,000 and sentenced to four months' home confinement and 18 months' probation. On appeal, defendants adduce a variety of trial defects, including the improper admission of evidence. The government cross-appeals the sentences on the ground that the district court misinterpreted the "volume of commerce" enhancement provision of the Sentencing Guidelines, U.S.S.G. § 2R1.1(b)(2) (1988 & Supp.1990), and erroneously failed to consider defendants' conduct in conspiring to fix the price of silicon metal, for which defendants were indicted and tried, but acquitted. We affirm the convictions; we vacate defendants' sentences, and remand for resentencing consistent with this opinion.

## BACKGROUND

We consider the evidence in the light most favorable to the government, which

---

1. The Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation.

prevailed at trial. *See United States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998).

Most of the suppliers of commodity ferrosilicon in the United States engaged in a price-fixing conspiracy that began in the fall of 1989 and continued until the summer of 1991. Several suppliers, including SKW and its competitor Elkem Metals Company, colluded to set a "floor price" for ferrosilicon to counteract price pressure from imports. Although conspirators cheated, and sales of ferrosilicon were generally below the targeted floor price, at least four witnesses (several of whom pled guilty to price-fixing charges) testified to conspiring with defendants. Charles Boardwine of Elkem testified that Zak called him to various meetings in the autumn of 1989 in order to set floor prices for ferrosilicon. These meetings were also attended by William Beard of American Alloys, Inc. and Arden Sims of Globe Metallurgical, Inc. At these early meetings, the group decided to set a floor price of 41 cents per pound, with the idea of raising the price to as much as 43 or 45 cents. Following the meetings, the participant companies sent out price quotations between 41 and 43 cents. Soon thereafter, a ferrosilicon buyer remarked to an Elkem salesman that it was "a little unusual," in light of the perceived market pressure, for the different firms to be quoting uniformly higher prices.

Early signs of cheating in the spring of 1990 led Zak to call a second meeting at which the suppliers discussed deviations from the target price. Witnesses testified that during this meeting Zak, Boardwine, and Beard discussed downward price pressures from non-cooperating co-conspirators and how to prop up the target price. Zak followed up on this meeting by making phone calls to other suppliers regarding their pricing strategy. John Barnyak, president of Minerais, testified that he received such a call, that Zak accused him of "destroying the effort to raise prices and breaking an agreement," and that Barnyak

responded to the effect that he "had no interest in sharing a cell with [Zak]."

Toward the end of 1990, Broadwine was replaced at Elkem by David Beistel, who testified at trial as the government's principal witness. During the transition period, Boardwine told Beistel about the floor price, and that Zak, Beard, and Sims were agreeing to take corrective action to raise prices. Over the next several months, Beistel and Zak had numerous telephone conversations during which they discussed target prices and cheating on the agreement. According to Beistel's testimony, the conspiracy continued on and off into 1991.

Over the course of the conspiracy, the suppliers frequently discussed the prices charged by competitors. Beistel and other witnesses testified that they understood from these various meetings and conversations, that there was an agreement to fix the price of ferrosilicon.

Defendants were charged with one count of conspiracy to fix prices in the ferrosilicon market and one count of conspiracy to fix prices in the silicon metal market, in violation of the Sherman Act, 15 U.S.C. § 1. At trial, the parties clashed repeatedly over the admissibility of certain critical evidence: a series of detailed but cryptic and sporadic notes taken by Beistel. Because Beistel had no independent recollection of the meetings or conversations—and his notes did not refresh his memory—admission of the notes into evidence was vital to his testimony. After voir dire on each exhibit, the notes were admitted under the business records exception to the hearsay rule, Fed.R.Evid. 803(6). Consequently, Beistel was able to read from, interpret, and explain his understanding of the notes. The district court clarified its ruling in a opinion issued following a post-trial evidentiary hearing, and admitted the set of notes both as business records and as co-conspirator statements pursuant to Fed.R.Evid. 801(d)(2)(E).

Defendants were convicted on the ferrosilicon count, and acquitted on the silicon

metal count. Applying the 1990 Sentencing Guidelines, the pre-sentence report calculated defendants' recommended offense level by using a base level of nine, and adding a two-level adjustment, pursuant to U.S.S.G. § 2R1.1(b)(2), to reflect that the "volume of commerce" attributable to defendants is between $16 million and $50 million. The PSR construed the term "volume of commerce" in § 2R1.1(b)(2) to include all $29,971,000 in ferrosilicon sales made by SKW during the span of the charged conspiracy (i.e., from October 1, 1989 to June 30, 1991). The district court construed "volume of commerce" more narrowly to include only those sales by SKW that were made at or above the target price during times when the conspiracy was "in effect" (i.e., a total of $361,443 in sales made during two time periods: from February 14, 1991 to April 4, 1991, and from May 29, 1991 to June 30, 1991). Accordingly, the district court therefore adjusted the offense level downward one level to reflect a volume of commerce below $1 million.

Although the jury acquitted defendants of conspiring to fix the price of silicon metal, the government sought a finding for sentencing purposes concerning the existence of such a conspiracy, and that the volume of commerce affected by that conspiracy was $16.5 million. The court refused to consider the silicon metal sales because the court found no evidence that the alleged silicon metal conspiracy was "successful ... and produced sales ... at or above an illegally-fixed floor price." These appeals followed.

## DISCUSSION

Defendants point to numerous supposed errors at trial,[2] of which one presents a substantial question on appeal: whether Beistel's business-related notes, which

were crucial to his testimony, should have been excluded from evidence. Therefore, this opinion addresses only (A) the admissibility of Beistel's notes, and (B) the government's cross-appeal regarding sentencing.

### A. Beistel's Notes

Over the period of the conspiracy, Beistel made contemporaneous notes of his conversations with Zak and other members of the ferrosilicon conspiracy. Based on the particular exhibits referenced by the parties on appeal, all of Beistel's notes are handwritten; most of them are dated; most of them bear notations to reflect the occasion, and the person or persons who supplied information or were present or on the phone; some contain detailed, tabular data, while others are fragmentary jottings; some are on full sheets of 8½" by 11" paper, while others are on hotel pads, other notepads, or in the margin of another document. The notes were not typed up, nor were they assembled into a diary, chronological file, or notebook; instead, they were kept in the attaché case that Beistel carried back and forth to work.

The district court admitted the Beistel notes on the grounds that they were business records, admissible under Fed. R.Evid. 803(6), and (alternatively) that they were co-conspirator statements, admissible under Fed.R.Evid. 801(d)(2)(E). We need not decide whether the miscellaneous stack of notes satisfies the business records exception, because we conclude that the notes were properly admitted as the statements of a co-conspirator.

▆▆▆ The district court has broad discretion regarding the admission of evidence. Evidentiary rulings are reversed only if they are "manifestly erroneous," such that the admission constitutes an abuse of discretion. See Phoenix Associ-

**2.** Defendants claim that (1) the price-fixing charges were barred by the statute of limitations; (2) the district court improperly allowed lay opinion testimony; (3) the district court improperly influenced witness testimo-

ny; (4) the district court erroneously refused to give certain jury instructions; and (5) the evidence was insufficient to support the jury verdict. We conclude that each of these claims is without merit.

*ates III v. Stone,* 60 F.3d 95, 100 (2d Cir.1995). In general, this court will "not overturn a trial judge's evidentiary rulings unless the judge acted arbitrarily or irrationally." *United States v. Blanco,* 861 F.2d 773, 781 (2d Cir.1988).

■ "Statements" made by defendants' co-conspirator—here, Beistel—that are offered against defendants are not hearsay, and may be admitted. *See* Fed.R.Evid. 801(d)(2)(E). Defendants argue that the notes are not "statements" for purposes of Rule 801(d)(2)(E). Rule 801(a) defines a "statement" as "an oral or written assertion . . . if it is intended by the person as an assertion." Beistel took notes of conversations with Zak and other co-conspirators in order to memorialize information supplied to him by his co-conspirators (including Zak)[3] and to provide a reference to help Beistel carry out his role in the conspiracy. For example, Government Exhibit 125 is a single loose-leaf sheet, titled "Rework of supply/demand," containing Beistel's handwritten notes from a February 4, 1991 meeting with Zak. Beistel testified that the notes outlined a plan to update and amend a multi-company supply and demand chart so that SKW and Elkem "could effectively increase the pricing to this floor price we agreed on." According to Beistel, this chart "was really the key document to being able to make this new floor price attainable," and Exhibit 125 was instrumental in recording the plan and reminding him to take action to carry it out. Thus, the notes were summaries of understandings and future commitments, and were therefore "statements."[4] *See United States v. Schmit,* 881 F.2d 608, 613 (9th Cir.1989) ("[N]otes containing information relevant to the conspiracy may be admissible against co-conspirators as statements in furtherance of the conspiracy. . . .").

■ "In order to admit a statement under [Rule 801(d)(2)(E) ], the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Maldonado–Rivera,* 922 F.2d 934, 958 (2d Cir.1990) (citing *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987)). The district court found that (a) a conspiracy to fix ferrosilicon prices existed, and (b) the declarant (Beistel) and the party against whom the statement was offered (Zak) were members of it. These findings are in essence uncontested on appeal, and in any event are not clearly erroneous. *See id.* at 959 (court's findings as to whether proffered statement meets the requirements of Rule 801(d)(2)(E) not to be disturbed unless clearly erroneous). Defendants argue, however, that the statements in Beistel's notes were not (c) in furtherance of the conspiracy.

■ To be in furtherance of the conspiracy, a statement must be more than "a merely narrative" description by one co-conspirator of the acts of another. *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1199 (2d Cir.1989) (internal citations and quotations omitted). The statements must "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." *Maldonado–Rivera,* 922 F.2d at 958. However, the statements need not be commands, but are admissible if they "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *Id.* at 959.

■ The statements in Beistel's notes were in furtherance of the conspiracy. On

---

**3.** Any statements of Zak recorded in Beistel's notes are not hearsay under Rule 801(d)(2)(A).

**4.** For purposes of Rule 801(d)(2)(E), it is irrelevant whether Beistel's notes recorded the conversations verbatim or whether they were Beistel's own interpretation.

one occasion memorialized in Beistel's notes, Zak and Beistel discussed the prices they would charge. In another memorialized conversation, they talked about the administration of the conspiracy and about the fact that some parties were cheating. Beistel's notes tracked the status of the conspiracy, may have reassured him as to its continued vitality, and may have prompted him to follow the price quotes he recorded from Zak. As Beistel testified, he kept "detailed notes of what was said, when and by who[m], as a means to follow up later." The notes were not "mere idle chatter," *United States v. Paone,* 782 F.2d 386, 390 (2d Cir.1986), but rather were intended by Beistel to act as a record and as a guide to future conduct. The statements therefore squarely fall within the ambit of the *Maldonado–Rivera* test, and were properly admitted pursuant to Rule 801(d)(2)(E). *See Maldonado–Rivera,* 922 F.2d at 958–59.

B. Sentencing: The "Volume of Commerce"

The district court adjusted defendants' base offense level downward—from nine to eight—to reflect the "volume of commerce" attributable to defendants. *See* U.S.S.G. § 2R1.1(b)(2) (1990). The government's cross-appeal contends that the district court misconstrued the term "volume of commerce": (1) by counting only those sales that SKW made at or above the fixed prices during periods in which the conspiracy succeeded in affecting prices, rather than all of SKW's sales (at any price) during the entire span of the conspiracy; and (2) by excluding sales made during the alleged silicon metal conspiracy.

■ We review the district court's interpretation of the "volume of commerce" enhancement provision of the Sentencing Guidelines *de novo.* *See United States v. Hernandez–Santiago,* 92 F.3d 97, 100 (2d Cir.1996).

1. *The Ferrosilicon Conspiracy*

■ Under the then-applicable section of the Guidelines, U.S.S.G. § 2R1.1(b)(2) (1990), the only explicit adjustment to the base level for price-fixing conspiracies was for the "volume of commerce" attributable to defendants.[5] At that time, § 2R1.1(b)(2) provided:

> For purposes of this guideline, the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services *that were affected by the violation.*

*Id.* (emphasis added).

The indictment alleged that the price-fixing conspiracy for ferrosilicon existed from October 1, 1989 through June 30, 1991. The district court found, however, that the conspiracy was "successful" only during two periods: (i) February 14 to April 4, 1991 and (ii) May 29 to June 30, 1991. It is possible (though unclear) that these two periods were the only ones in which the conspiracy was found to be successful *because* the agreement to fix prices failed to influence the commodity price, the volume of commerce, or the terms of trade *except* during these two limited periods. We think that such a finding, where a district court can make one, appropriately describes, for sentencing purposes, the period or periods in which the sale of a commodity is "affected by" a price-fixing conspiracy. It is also possible, however, that these two periods were the only ones in which the conspiracy was found to be successful because it was only in these periods that sales were executed at or above the conspirators' target price. That would be error. We conclude that a price-

---

5. As of 1990, the adjustments to the base level were as follows:

| Volume of Commerce | Adjustment |
| --- | --- |
| Less than $1 million | subtract 1 |
| $1–4 million | no adjustment |
| > $4 million | add 1 |
| > $15 million | add 2 |
| > $50 million | add 3 |

U.S.S.G. § 2R1.1(b)(2) (1990).

fixing conspiracy can affect prices even when it falls short of achieving the conspirators' target price, and we therefore cannot affirm the district court on this point.

■ The government argues that because entering into a price-fixing conspiracy is a *per se* violation of the Sherman Act, all sales made by SKW between the inception and the end of the conspiracy were "affected by" the illegal agreement, whether the sale prices were at, above, or below the target price. Since proof of an illegal agreement to fix prices is all that is required to support a conviction, the government argues that it is inconsistent and inefficient to require proof of actual anticompetitive effect on prices in order to apply the "volume of commerce" enhancement provision. The government's brief cites the potential burden of actually having to prove the efficacy of the conspiracy at the sentencing phase:

> If an inquiry into competitive effect were simply postponed from the trial phase to the sentencing phase, the efficiencies resulting from application of the *per se* rule would be nullified. The government would have to gather additional evidence at the grand jury and trial stages in order to prove at sentencing the actual effect of the conspiratorial agreement on each and every sale.

We conclude that a conspiracy warranting conviction can exist even if, for sentencing purposes, it does not succeed in affecting prices throughout the entire period of the conspiracy, or at all, and we therefore reject the government's all-inclusive formula.

■ Our interpretation of the phrase "volume of commerce ... affected by the violation," U.S.S.G. § 2R1.1(b)(2), is supported by the plain language of the Guidelines, which, if unambiguous, controls. *See United States v. Lewis*, 93 F.3d 1075, 1080 (2d Cir.1996). The phrase is not defined in the Guidelines, is not used

elsewhere in the Guidelines, is *sui generis* to the Guidelines in the antitrust context, and is not a term of art. We therefore look to the ordinary meaning of the words. The sum of what dictionaries say about the relevant meaning is that the verb "to affect" expresses a broad and open-ended range of influences. *See, e.g., Black's Law Dictionary* 57 (6th ed. 1990) ("To act upon; influence; change; ... often used in the sense of acting injuriously upon persons or things."); *Webster's Third New International Dictionary* 35 (1986) ("to act upon"; "to produce a material influence upon or alteration in"). We therefore conclude that a conspiracy need not achieve its specific goals or targets in order to affect commerce for sentencing purposes. Sales can be "affected" by a conspiracy when the conspiracy merely acts upon or influences negotiations, sale prices, the volume of goods sold, or other transactional terms. While a price-fixing conspiracy is operating and has *any* influence on sales, it is reasonable to conclude that all sales made by defendants during that period are "affected" by the conspiracy.[6] *See United States v. Hayter Oil Co.*, 51 F.3d 1265, 1273 (6th Cir.1995). Here, once it was found that the price-fixing conspiracy was successful during two periods, it was error to calculate the effect on commerce solely in terms of the sales that were made at or above the target price, without considering as well the sale prices that were influenced (without hitting or exceeding the target price), or sales that were affected in other ways.

The relevant Guidelines Commentary is ambiguous and does not contradict the plain language. The Commentary suggests a relationship between the profit of the price-fixing conspiracy and the volume of commerce enhancement. *See* U.S.S.G. § 2R1.1 (Comment.) (Bkgrd.) (1990) ("The offense levels are not based directly on the damage caused or profit made by the de-

---

**6.** It is uncontested that the commerce affected by the conspiracy, for sentencing purposes in this case, includes at most the sales made by

the defendant's firm. *See* U.S.S.G. § 2R1.1(b)(2).

fendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute."); *id.* ("Substantial fines are an essential part of the sanction. It is estimated that the average additional profit attributable to price fixing is 10 percent of the selling price."). In light of the Commentary, the district court concluded that "the volume of commerce includes profit from price-fixing, which requires that the commerce at issue be sold at or above the illegally fixed price."

We disagree. It is clear that the sentence adjustment for the volume of commerce under § 2R1.1 is one partial way to account for the profits earned by conspirators, but a conspirator profits from an agreement to fix prices when the conspiracy is incrementally successful at impacting the terms of trade or at elevating the price above the putative market price, regardless of whether the target price is achieved.[7] A finding as to the volume of affected commerce does not require a sale-by-sale accounting, or an econometric analysis, or expert testimony. A court may consider the goals of the conspiracy and the steps taken to implement it, the market share of the conspirators, and the perceptions of the conspirators and the persons with whom they transacted business, and may otherwise deduce the effect on commerce from the pressures brought to bear on it.

By the same token, a price-fixing conspiracy that fails to influence market transactions notwithstanding overt acts sufficient to support criminal responsibility has affected no sales within the meaning of the Guidelines. The government argues that any inquiry into the anticompetitive effect of an illegal agreement is incompatible with the *per se* nature of the government's burden of proof as to the criminal elements of Sherman Act violations, and cites as support the Guidelines' measure of the volume of commerce in lieu of actual damages. The Commentary does indeed emphasize that the sentencing inquiry should avoid a transaction-by-transaction, sale-by-sale approach, and that the sentencing court should use the "volume of commerce" calculation as a rough approximation of the damage caused by the conspiracy. *See id.* ("The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute [for such calculations]."). But this lightening of the government's burden does not excuse altogether the government's need to prove that the prices charged were "affected by" the conspiracy. If the conspiracy was a non-starter, or if during the course of the conspiracy there were intervals when the illegal agreement was ineffectual and had no effect or influence on prices, then sales in those intervals are not "affected by" the illegal agreement, and should be excluded from the volume of commerce calculation.

The Sixth Circuit in *Hayter Oil* ruled that the volume of commerce is calculated "without regard to whether individual sales were made at the target price." *Hayter Oil,* 51 F.3d at 1273. That ruling is generally in accord with the analysis we adopt. However, the government invites us to adopt the *result* in *Hayter Oil,* which directs the district court to "include[ ] all sales ... made by the defendant ... during the period of the conspiracy." *Id.* We decline, because we conclude that the persuasive arguments in the *Hayter Oil* opinion do not mandate that result in this case.

The *Hayter Oil* court reasoned in part that "[i]t would be an anomaly to declare

---

7. In this case, the conspiracy of sellers was intended to counteract falling ferrosilicon prices, *i.e.* to stabilize prices, or even raise them. Such a conspiracy would be successful when the sale price exceeds the price that would have prevailed in the absence of the conspiracy, even if the price increment was less than the competitors hoped for or aimed at.

price-fixing illegal per se, without regard to its success ... but to provide for a fine only if the price-fixing were successful." *Id.* at 1274. We agree that ineffectual price-fixers should not escape meaningful penalty, particularly considering that the Guidelines scheme for price-fixing crimes relies on general deterrence and fines rather than long jail sentences. As the Commentary emphasizes, "[t]he controlling consideration underlying this guideline is general deterrence." U.S.S.G. § 2R1.1 (Comment.) (Bkgrd.) (1990) ("The Commission believes that the most effective method to deter individuals from committing this crime is through imposing short prison sentences coupled with large fines."). However, "general deterrence" is also served by mandatory minimum fines. *See* U.S.S.G. § 2R1.1(c) (1990) ($20,000 minimum fine for individual conspirators; $100,000 for organizations). Presumably, "general deterrence" can be adequately served without sentencing on the basis of a tenuous presumption that commerce is affected by all sales within the period set forth in the indictment regardless of what effects, if any, the conspiracy may have had.

On remand, the district court will have the opportunity to reconsider its finding in light of this opinion, and may elect to adopt a new finding on the subject, or adhere to the finding it has made.

### 2. *The Silicon Metal Conspiracy*

■ Defendants were acquitted of the separate charge of conspiracy to fix the price of silicon metal. The sole question on appeal is whether the district court, in calculating the volume of commerce for sentencing purposes, erred in failing to consider the volume of commerce affected by the silicon metal conspiracy. The district court found that the testimony of two witnesses "may establish" that price-fixing meetings occurred, but that "the testimony and other evidence falls short of establishing a successful price-fixing agreement was put in place and produced sales of silicon metal at or above an illegally-fixed floor price."

The government argues that the district court's refusal to factor in the acquitted conduct is based on an error of law, which cannot be a proper exercise of discretion. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990).

A sentencing court may take into consideration acquitted conduct if the government has proved the acquitted conduct by a preponderance of the evidence and the defendant was convicted of another crime at the same trial. *See* U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, ... the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."); *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (holding that a court may consider conduct underlying the acquitted charge as long as the conduct was proved by a preponderance of the evidence).[8]

The record reflects that the district court misapprehended its authority to take account of the acquitted conduct. Entry into an agreement to fix prices—even if the implementation of such an agreement is unsuccessful—is the illegal conduct under the Sherman Act, 15 U.S.C. § 1. As discussed above, if the conspirators agreed to fix prices of silicon metal, and the conspiracy affected prices, the district court

---

8. *Watts,* recognizing a circuit split, left open the question of whether "in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." *Watts,* 519 U.S. at 156, 117 S.Ct. 633 (citing *United States v. Gigante,* 39 F.3d 42, 48 (2d Cir. 1994) (holding that the preponderance standard is appropriate, but noting in dicta that the preponderance standard "provides no more than a threshold basis for adjustments and departures, and we believe that the weight of evidence is at some point a factor to be considered by a court with regard to both adjustments and upward departures."), *amended by* 94 F.3d 53, 56 (2d Cir.1996)).

may consider this as relevant conduct for sentencing purposes without regard to whether the sales were at or above the price fixed by the illegal agreement.

## CONCLUSION

We affirm the judgments of conviction. However, we conclude that the district court misapplied the "volume of commerce" provision of the Sentencing Guidelines, and misapprehended its authority to consider the acquitted conduct. Therefore, we vacate defendants' sentences, and remand for a recalculation consistent with this opinion.

JON O. NEWMAN, Circuit Judge, concurring in substantial part:

The narrow issue that prompts this separate concurrence is how to determine the amount of commerce "affected" by a price-fixing conspiracy for purposes of sentencing. The Sentencing Guidelines specify that the offense level for price-fixing is to be calculated according to "the volume of commerce done by [the defendant] or his principal in goods and services that were *affected* by the violation." U.S.S.G. § 2R1.1(b)(2) (emphasis added). All members of the panel agree that the District Court erred in counting only those sales made at or above the fixed price. We also agree that the Government should not be sustained in its contention that all sales made during the conspiracy period are *conclusively* presumed to have been affected by the conspiracy. The majority adopts a multi-factor test aimed at determining those sales "influenced" by the conspiracy. See at 195 F.3d at 90. I believe the majority's approach is unclear, includes reliance on some irrelevant factors, and, depending on how sentencing judges interpret it, either erects (1) too high a standard, which can be met only after the sentencing judge is obliged to hold a protracted hearing, or (2) a low standard, which is fairly easy to meet but nonetheless adds some needless complexity to a sentencing hearing. In my view, the relevant guideline is faithfully and sensibly applied by using a *rebuttable* presumption that all sales within the conspiracy are "affected" by the price-fixing agreement, with the defendant free to prove, or at least come forward with evidence, that one or more particular sales were not so influenced.

Once a seller agrees to fix prices, he either sells at that price or (unless he is both a price-fixer and an amnesiac) at least has the fixed price in mind and uses it as a point of departure for himself in deciding what slightly different price to quote for almost every sale he makes during the period of the conspiracy. As long as the seller has the fixed price in mind when he decides by how much to depart from it when quoting a price, his final sale price has been affected by the price-fixing agreement. The whole point of punishing price-fixing agreements is to oblige sellers to respond to all the forces at work in an unrestricted market, and adding the element of a fixed price to a seller's thought process will almost always skew the price quotation and the final sale price to some degree that the antitrust laws endeavor to prevent.

A rare instance might arise when, under unusual circumstances, a seller quotes or agrees to a price without any reference to the fixed price. For example, a defendant's brother-in-law might call one day and ask for a product at a bargain price in order to make a quick and urgently needed resale, and the seller agrees to the bargain price motivated solely by concern to help his relative, with no thought whatever about the fixed price against which he quotes to all other customers. Since a rare circumstance of that sort would be peculiarly within the knowledge of the defendant, it is entirely appropriate to oblige him to prove it, or at least come forward with evidence of it. Criminal law sometimes imposes on a defendant a burden of proving a defense, *see, e.g.,* 18 U.S.C. § 17(b) ("The defendant has the burden of proving the defense of insanity by clear and convincing evidence."), or at least com-

ing forward with evidence of a defense, *see, e.g., United States v. Caban,* 173 F.3d 89, 94 (2d Cir.1999) ("In order to be entitled to a duress instruction, '[a] defendant must present some evidence on all the elements of the defense....'") (quoting *United States v. Podlog,* 35 F.3d 699, 704 (2d Cir.1994)). At sentencing, a defendant must prove entitlement to downward adjustments and departures. *See. e.g., United States v. Gomez,* 103 F.3d 249, 255 (2d Cir.1997) ("burden at sentencing is on the defendant" to prove mitigating role in criminal activity under U.S.S.G. § 3B1.2). Obliging a defendant to prove, or at least come forward with evidence, that a particular sale was not affected by a price-fixing conspiracy is a simple and rational way to implement section 2R1.1(b)(2).

The majority's approach, however, proceeds along a different course, the contours of which are not clear. The majority instructs the sentencing judge to consider "[1] the goals of the conspiracy, [2] and the steps taken to implement it, [3] the market share of the conspirators, [4] and the perceptions of the conspirators and [5] the persons with whom they transacted business, *and may otherwise deduce the effect on commerce from* [6] *the pressures brought to bear on it.*" at 91. The first factor seems pointless since it is difficult to imagine a price-fixing conspiracy that did not have as its goal selling at prices above those to be obtained in an unrestricted market. The second factor seems irrelevant to sentencing since it is difficult to see why the price-fixers who hire comparison shoppers to see how faithfully their co-conspirators are adhering to the fixed price should receive extra punishment, while those who take no such steps in the justified confidence that their co-conspirators can be trusted should draw lesser sentences. Market share also seems irrelevant since price-fixers should not draw lesser sentences simply because they mod-

estly try to extract extra profits from only a small segment of the market.[1] The perceptions of the conspirators is an unclear factor, since we are not told what the relevant perceptions concern. If they concern the degree of success of the conspiracy, such perceptions might have some arguable relevance to the fact of success, but it is difficult to see why those who are less sure of the success of their conspiracy should receive less punishment. The perceptions of the customers seem irrelevant since no lesser punishment should be imposed just because a customer is unaware that the quoted price has been set at, or at least in relation to, a fixed price; the price is artificial, whether or not the customer knows it. The final factor of "the pressures brought to bear on" commerce appears to be only another way of describing the second factor, the steps taken to implement the conspiracy.

Fortunately, the majority has not required sentencing judges to ascertain the hypothetical price that would obtain in an unrestricted market. That inquiry would oblige the sentencing judge to conduct a far-ranging and complex inquiry, more suitable to the damage phase of a civil case than the sentencing phase of a criminal case. And the majority sensibly eschews any requirement of "a sale-by-sale accounting, or an econometric analysis, or expert testimony." at 91. But the resulting multi-factor approach will, I fear, leave district judges unclear whether they are to conduct an elaborate inquiry in an effort to gauge the "influence" of the conspiracy, or find the requisite "influence" simply from such normally available factors as the goals of the conspiracy and some steps to enforce it, for example, one or more meetings after the initial meeting where the price-fixing agreement was made. Such uncertainty is not warranted.

---

1. Of course, conspirators with a small market share might find that some of the customers from whom they hoped to extract extra profits will purchase elsewhere in the market, but normally the price to any customers that remain will be quoted with reference to the fixed price and, to that extent, influenced by the fixed price.

The majority's approach is also vulnerable because it creates a needless circuit variation from the only reported case on this subject. The Sixth Circuit has ruled that all of a defendant's sales within the conspiracy period count in determining that defendant's affected volume of commerce for purposes of sentencing. *See United States v. Hayter Oil Co.*, 51 F.3d 1265, 1273 (6th Cir.1995). In the four years since that decision, the Sentencing Commission has given no indication that the Sixth Circuit's approach did not faithfully implement section 2R1.1(b)(2) on the facts of *Hayter Oil.* That case did not involve the rare circumstance I have posited of a sale that is demonstrably uninfluenced at all by the price-fixing agreement. I would not count such a sale, and I suspect that the Sixth Circuit also would not do so. Indeed, I suspect that the only reason the Commission used the phrase "volume of commerce ... affected by the violation" instead of "volume of commerce during the conspiracy" is to recognize the possibility that such an exception might be warranted on extreme facts.

For all of these reasons, I concur in the result and in all aspects of Judge Jacobs' opinion except the portion governing the sentencing judge's task on remand. As to that, I can only express the hope that sensible sentencing judges will resolve the ambiguities in the Court's opinion in favor of a simple approach that relies on readily provable factors and thereby punishes price-fixers for substantially all of the sales they make during the period of their criminal conspiracy.