10-638-cr
United States v. Persing (Benedict)

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 26th day of August, two thousand eleven.

PRESENT: ROSEMARY S. POOLER,
     ROBERT D. SACK
     GERARD E. LYNCH,
        *Circuit Judges.*

-------------------------------------------------------------------

UNITED STATES OF AMERICA,
        *Appellee*,

     v.                No. 10-638-cr

JOHN PERSING, SR., JOHN PERSING, JR., JAMES OUTERIE, AKA Jamsie, ANTHONY ANASTASIO, AKA To To, RUSSELL FERRISI, VINCENT FAUCI, AKA Vinny the Cop, AKA Vinny the Tic, STEPHEN ROBERTS, BENEDETTO DiCOSTANZA,
        *Defendants*,

DAVID BENEDICT,
        *Defendant-Appellant.*

-------------------------------------------------------------------

FOR APPELLANT:  VIVIAN SHEVITZ, Brooklyn, New York.

FOR APPELLEE:  DANIEL S. SILVER, Assistant United States Attorney (Susan Corkery, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York.

Appeal from the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED in part and REMANDED in part.

David Benedict appeals his conviction, after jury trial, on two counts of extortion, two counts of extortion conspiracy, one count of extortionate collection of credit, two counts of extortionate collection of credit conspiracy, and one count of racketeering conspiracy. The district court sentenced him cumulatively to 36 months of incarceration and 36 months of supervised release, plus $1,500 in restitution.

It is undisputed that Benedict involved himself with certain individuals connected to the Gambino organized crime enterprise and that he and they together exacted payment from various others. The parties have disputed whether his involvement with these individuals crossed the line into conspiracy and whether his role in demanding payment crossed the line into extortion. The jury answered these questions in the affirmative, finding him guilty of all crimes charged but one count of extortionate collection of credit (out of several).[1] On appeal, Benedict contests the sufficiency of evidence to support his convictions for three specific sets of counts, the instructions the district court gave to the jury, and the admission of certain computer records into evidence. We address these issues in turn.

---

[1] The judgment does not reflect Benedict's acquittal on Count 7 of the indictment. The judgment also describes another count, Count 5, as "Extortionate Collection of Credit *Conspiracy*" although it should be "Extortionate Collection of Credit." We suggest that the district court amend the judgment accordingly on remand.

I.    **Challenges to the Sufficiency of the Evidence**

    **A. The Galano Extortion**

Benedict argues that the government presented insufficient proof to convict him of extorting the Galano brothers, owners of a bakery in Staten Island. The evidence, to the contrary, demonstrated a classic protection racket. At the direction of James Outerie, a "made" Gambino family member, Benedict and another individual went to the Galanos' bakery before Christmas of 2004 and approached John Galano, uninvited, to request money "for a friend," saying that "it would be worth it." After Galano refused the first overture, Charlie Smith, an associate of Benedict's, returned several times until Galano gave him $500 "[t]o look out for the store." The next Christmas, Benedict sent Smith back to the bakery with instructions to "[t]ell 'em, don't give us five hundred" that time. When only $500 was offered, Benedict told Smith to "take care of that" and Smith returned and took $2,000, which he then gave to Benedict to give to Outerie.

Benedict argues that nothing in the record shows that he induced the Galanos to pay money through the "wrongful use of . . . fear," as the statute requires. 18 U.S.C. § 1951(b)(2). But the government presented sufficient evidence, albeit largely circumstantial, of the Galanos' fear. When John Galano asked why he should pay, one co-conspirator explained that Outerie "was a made man" in the Gambino family, which, as was explained to the jury, is known for extorting individuals and businesses under implicit threats of violence. Benedict points to no services that the Galanos obtained commensurate to their payments and suggests no plausible reason why the Galanos would be so charitable to

3

various mob-connected individuals. Moreover, Galano was also asked, "[d]id you have concerns that something might happen to your store if you didn't pay this?" and responded, "[y]ou never know." The jury did not have to credit John Galano's testimony, cited by Benedict, that he was not "scared," just "upset" at the requests. As the district court properly instructed, the jury could find the existence and exploitation of fear despite the victim's testimony that he was not afraid. Benedict strains credulity when he further argues that, whatever the intentions of the others in the group, he could not have seen an implied threat in his actions because he believed that "people 'put money together' for guys at Christmas [only] because they helped people," and the jury was certainly entitled to conclude that Benedict was not so naive.

## B. The Smith Extortion

Benedict also challenges his conviction for extorting Charlie Smith, who, like the Galanos, paid Outerie (through Benedict) for protection. Smith had long done business with Benedict in auto parts (often stolen) and "insurance give-ups" (in which cars were wrecked for the insurance money). When Smith ran into trouble with other underworld figures, Benedict introduced him to Outerie, who expressed his willingness to help Smith resolve these troubles. Outerie inquired into Smith's corresponding willingness to "share [with] friends," and Smith assured him on the point. Benedict and Outerie gave Smith many opportunities to "share," as Outerie repeatedly demanded money from Smith, usually through Benedict. Smith paid sums of $1,000, $2,500, and $2,000, which he often had to break down further into installments because of claimed financial difficulties. Smith also began giving Benedict car parts for free instead of charging for them.

A number of facts in the record support the jury's conclusion that Benedict wrongfully used fear to make Smith pay. Smith testified that he was "unhappy" about having to pay and that he paid not only out of gratitude for Outerie's and Benedict's help in resolving his problems but also because "it was easier to pay it, not [to] have any aggravation." He testified to concern that, if he did not pay, cars might be "burned in the yard, things would happen unexpectedly," which the jury could have taken to refer to the auto yard where Smith worked.[2]

Other evidence supported the inference that Smith had reason to fear that failure to pay would have consequences beyond losing Outerie's services. Members of the Gambino organization, the jury heard, visit their "extortion victims" around Christmastime and demand "as much money as [they] can," sometimes making explicit threats but often without having to do so because the victims all "kn[o]w the drill." And Smith, like the Galanos, was made well aware of the sort of people he was dealing with. Benedict first described Outerie to Smith as "a made guy," and at the first meeting of the three of them Outerie "kept bringing up Junior and . . . referring to Gotti," to make his connections clear. And when Smith asked Benedict why he had to pay Outerie, Benedict responded not that Smith needed to pay to maintain the services he had been receiving, but rather that "everybody pays" Outerie as "a Christmas gift." The implication was that Smith stood in the same relation to Outerie and Benedict as any of their other extortion victims – like the Galanos – and was paying them the same extortion money, not buying any service from them.

---

[2] The testimony might have referred, as Benedict suggests, to Benedict's yard, but the choice of interpretations belonged to the jury.

Benedict argues that "Smith was a tough guy" who "knew how to say 'no,'" and that the tapes he made as a cooperator in which he expressed difficulty paying were "theatrical, solely for the purpose of creating a false inference that he was 'forced' to make a Christmas payment to James because of fear." The jury could have interpreted the evidence that way, but we must defer to its opposite conclusion about Smith's credibility. See United States v. Rojas, 617 F.3d 669, 674 (2d Cir. 2010).

Similarly, the jury was entitled to give little weight to evidence that Benedict on occasion expressed sympathy for Smith and fronted Smith money when he could not afford to pay Outerie right away. Just as playing "good cop" does not make someone less of a cop, playing "good extortionist" did not necessarily make Benedict less of an extortionist. Benedict's help to Smith never extended to telling him he should not pay Outerie or guaranteeing his safety if he came up short. On this evidence, it was for the jury to decide whether Benedict acted as a concerned friend, or as an extortionist, or both.

Benedict also disputes another element of this crime, arguing that his actions toward Smith did not "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). But the law requires only "a very slight effect on interstate commerce," which may generally be proven "by showing that the victim directly participated in interstate commerce." United States v. Perrotta, 313 F.3d 33, 36-38 (2d Cir. 2002) (quotation marks omitted). Here, Smith participated in interstate commerce, and presumably obtained the money to make his payments, by dealing in auto parts and defrauding insurance companies. Demonstrating the interstate nature of his trade, Smith in fact had pled guilty to possessing and transferring stolen car parts across state lines.

## C. Racketeering Conspiracy

Benedict's remaining sufficiency challenge targets the government's proof of racketeering conspiracy. He concedes the existence of a "Gambino enterprise," but argues that the government failed to prove that he conspired to participate in the enterprise's affairs. See 18 U.S.C. § 1962(c), (d). Specifically, Benedict argues he was "merely present" and did not know "the rules" about how the organization worked.

The jury had ample evidence from which to conclude to the contrary. Primarily, as recounted above, Benedict directly participated in two separate (but related) racketeering activities. See 18 U.S.C. § 1961(1)(B). Moreover, on at least one occasion, Benedict teamed up with Outerie in a fight over "a wiseguy issue." Benedict also hired Joe Watts, a Gambino associate known as a "big earner" who "do[es] murders" for the organization, for a "credit consultant" job that appeared to have little to do with actual credit consulting. The parties dispute Benedict's intentions in hiring Watts, but the simple fact that Benedict hired Watts (and was able to ally himself with Watts when it appears others were also interested in doing so) shows the depth of his involvement with the Gambino organization.

## II.    **The Jury Charge**

Benedict next contends that the district court should have read his proposed "theory of the defense charge" to the jury. The district court rejected that proposal, dismissing the proposed instruction as Benedict's "closing argument." We find no error in that decision, given that the requested charge was long, argumentative, and not always entirely clear. Further, and perhaps most importantly, the district court's actual instructions "correctly

7

convey[ed] the required legal principles," United States v. Ganim, 510 F.3d 134, 142 (2d Cir. 2007), including all the points of law raised in Benedict's proposed charge, though of course without the same argumentative spin. And, contrary to Benedict's argument, the fact that the district court also read the indictment to the jury, while properly warning that it was not evidence and was provided only for help in understanding the charges, did not require the court to add what was effectively Benedict's closing argument to the instructions as well.

Nor do we see any problem with the district court's instruction that the jury could find "that an alleged victim yielded to extortion and demands out of fear of physical or economic injury, even if the alleged victim testified that he was not in fear." This was a correct statement of the law, as the jury is free to accept part of a witness's testimony and reject other parts of it. See United States v. Ware, 577 F.3d 442, 447 (2d Cir. 2009). Moreover, the court properly balanced that instruction, emphasizing that the jury might also rely on a witness's testimony that he was not in fear to find a defendant not guilty, and imposing additional conditions before the jury could find guilt in spite of such testimony. Benedict's challenge to the jury instructions fails.[3]

---

[3] We nevertheless think it worth noting one issue with the district court's charge, which stated in part that "[i]t is enough that a defendant exploited or attempted to exploit fear that he knew had been created by one or more persons or groups and thereby wrongfully obtained . . . property." This correctly sets out the law if one understands it to preserve wrongfulness as an independent criterion, in the sense of "a defendant exploited fear and thereby obtained property in a way that was wrongful." One might, however, interpret this sentence out of context to suggest that exploiting fear to obtain property is enough, because it is *ipso facto* ("thereby") wrongful. Such interpretation would expand the crime's ambit to include all sorts of innocent conduct such as, for example, the sale of burglar alarms. Cf. United States v. Abelis, 146 F.3d 73, 84 (2d Cir. 1998). This sentence therefore had potential

III.    **Admission of Computer Records as Coconspirator Statements**

Benedict also argues that the district court should not have admitted records found on the computer of John Persing, Sr. Persing, a loan shark, had extended loans to several associates of Smith who were unable or unwilling to pay back those loans, causing Persing to make various threats against the debtors and to attack Smith. Benedict intervened in an attempt to have the loans repaid – either, as the defense contends, because he wanted to help Smith and the debtors out of their jam or, as the government argues, because he wanted to take some of Persing's business – and on that basis was convicted of extortionate collection of credit and extortionate collection of credit conspiracy. Benedict challenges the admission of Persing's computer records as coconspirator statements. We remand to the district court for further explanation of its ruling.

Benedict's Confrontation-Clause challenge to the admission of these records is unavailing, since the records were made for Persing's private use and are therefore not testimonial. See Crawford v. Washington, 541 U.S. 36, 56 (2004). Whether the records were nevertheless inadmissible hearsay is a closer question. The Federal Rules of Evidence exempt from the definition of hearsay any "statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit

to mislead, and future courts would do well to phrase it differently.

This conclusion provides little help to Benedict, however, who did not raise the potential ambiguity we identify in the wording here or below. Further, context counts when reviewing instructions, see United States v. Sabhnani, 599 F.3d 215, 237 (2d Cir. 2010), and the rest of the charge repeatedly emphasized the importance of the wrongfulness requirement, see Abelis, 146 F.3d at 83-84.

evidence under this exemption, "the district court must find by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Farhane, 634 F.3d 127, 161 (2d Cir. 2011) (quotation marks omitted). "The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." Fed. R. Evid. 801(d)(2). Whether these preconditions are met is a question of fact that we review only for clear error. See United States v. Maldonado-Rivera, 922 F.2d 934, 959 (2d Cir. 1990).

The district court correctly concluded that, to the extent that a conspiracy existed, Persing's notes – which were designed to assist him in conducting his loan-shark business – were taken during the course of and in furtherance of that conspiracy, satisfying the third prong of the test above. See United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88-89 (2d Cir. 1999); United States v. Orena, 32 F.3d 704, 715 (2d Cir. 1994). The real question, therefore, was whether there was a single conspiracy that included both Benedict and Persing.

Nowhere in the record can we find an indication that the district court answered this question. Defense counsel raised the issue before the notes were admitted on the last day of testimony. The district court initially stated that "[t]here is certainly not evidence that there was a conspiracy." After elaboration by Benedict's counsel, the court suggested that

10

Benedict's point "goes to more of a Rule 29 issue," expressed its skepticism that "the government has made its case on that," and appeared to side with the defense's argument that Benedict "was almost trying more to protect [an extortion victim] than to facilitate the illegal transaction," but said that it did not want to "prejudge the Rule 29 issue." Further colloquy ensued regarding specific portions of the records, all consistent with the judge's skepticism, or at least agnosticism, about the existence of a conspiracy encompassing both Persing and Outerie, and none indicating that such a finding existed. Reviewing one portion of the records, the court found that it was made "in furtherance of the conspiracy, *if there's a conspiracy*," and, reviewing another portion, found "*to the extent again that a conspiracy is made out* then this is in furtherance of it." (Emphases added.) At one point, apparently when describing another exhibit (GX99B) that was not offered against Benedict, the court stated that "[a]s far as the other ones, I do think that's coconspirator stuff and I will allow those," but it is not clear that the "coconspirator stuff" finding included a finding that a conspiracy existed and that the defendant in question was a member of the conspiracy, nor is it determinable whether the finding had anything to do with Benedict. And it does not appear that the issue was addressed again. Shortly after this colloquy, the government offered, and the judge admitted, the Persing records, asking only for "[a]ny other than the prior objections?" to which defense counsel responded that he had nothing further.

As a general matter, a district judge need not make explicit findings on the record before admitting evidence. "[A] simple 'sustained' or 'overruled' will ordinarily suffice." Leopold v. Baccarat, Inc., 174 F.3d 261, 269 n.11 (2d Cir. 1999). Here, however, two factors

11

lead us to decline simply to assume that the court implicitly made the necessary findings and proceeded to assess the sufficiency of the evidence to support them. First, the court's statements reflected the absence of any finding, explicit or otherwise, and suggested that, had the court made a finding, it would have found no conspiracy. Second, whether such a finding would have been clearly erroneous presents an extremely close question.

On the first point, the colloquy about the evidence makes it difficult to indulge in the usual presumption that, by admitting the evidence, the judge implicitly made the findings necessary to support its admission. This is not a case where, despite the trial judge's initial skepticism, the later admission of the evidence indicates that the judge changed his mind upon further reflection. Not only did the judge never renounce his doubts, but he continued to express them even after admitting the records. At the Rule 29 colloquy later that day, the judge maintained that he was "concerned" about the extortionate-collection-of-credit counts and seemed to agree with the defense theory that Benedict was just trying to resolve the conflicts between Persing and Smith and the various debtors. In response, the government explicitly disclaimed any reliance on a Persing-Benedict conspiracy, arguing instead that Benedict conspired with Outerie to "take some of John Persing's business." Even on that point, the judge continued to express skepticism to a degree that led the prosecutor to joke that he was "glad [the judge was] not on the jury." The discussion seems inconsistent with any finding that Benedict and Persing were ever members of the same conspiracy.

12

Second, it is not clear that we could affirm a finding that Benedict and Persing were members of the same conspiracy even had such a finding been made. Cf. United States v. Al-Moayad, 545 F.3d 139, 173 (2d Cir. 2008). The evidence is, at best, weak. Although some of Benedict's actions are consistent with the existence of such a conspiracy, much of the evidence to which the parties have directed this Court points away from that conclusion. Smith testified that Persing was "technically with no one."[4] And, although Benedict tried to connect with Persing, we see no evidence that that connection was ever completed and some evidence suggesting it was not. In the computer records themselves, Persing reports that Benedict approached him about the loans and that he told Benedict "not to involve himself in this issue." While Benedict tried to help Persing collect the debts, and in fact threatened one of Persing's debtors, he also expressed sympathy for them, a desire to help them avoid Persing's harassment, and contempt for Persing's methods. Smith even testified that Benedict threatened to report Persing to the FBI if he did not leave one of the debtors alone.

There is also little evidence of a conspiracy between the two through Outerie, although both Benedict and Persing had some sort of relationship with him. At least once,[5] Persing offered a "20% recovery fee" to Outerie, who told Persing he would "get back to

---

[4] The jury was entitled to infer that, in the jargon of organized crime, being "with" someone signifies being a member of that person's "crew," or being subordinate to him in the organization's hierarchy.

[5] And maybe twice: an identical-seeming incident is recorded in one document as occurring on "8-27-05" and in another document as occurring on "7-27-05." It is possible that these incidents are one and the same or that a similar incident happened twice.

13

[him]," but Persing's records, despite their apparent comprehensiveness, describe no acceptance of this offer. At another point, Outerie proposed another meeting with Persing and Persing refused, further suggesting a failure to agree. Moreover, even if Benedict and Outerie conspired and Outerie and Persing conspired, it does not necessarily follow that they were all part of the same conspiracy. In sum, we see little in the record to support a conclusion that Benedict and Persing belonged to the same conspiracy.

That said, we cannot definitively say that a finding of a conspiracy between Benedict and Persing, if made, would have been clearly erroneous. Clear-error review requires us to consider "the record as a whole," Doe v. Menefee, 391 F.3d 147, 164 (2d Cir. 2004), but the parties have not provided much help in navigating that record.[6] The district judge, who observed the demeanor of the witnesses and is far more familiar than we could be with the details of the testimony, may have based a finding on aspects of the record that may have eluded us and that give additional color to the evidence we have discussed. It is hard to evaluate the district court's finding without knowing whether it made one or, if it did, on what grounds it based the finding.[7]

---

[6] The government provided only a limited appendix, which is helpful on some points but contains none of the district court's discussion of the coconspirator-statements issue. The defendant, meanwhile, effectively provided no appendix and cites directly to the transcript.

[7] We cannot avoid the issue by finding the admission of the Persing records harmless. The government, despite arguing to us that the records were harmless, relied heavily on them in its closing argument to the jury, and even in its brief to this Court. And it did so with good reason: the records provide several key facts that do not appear elsewhere in the record, such as Persing's offer of the 20% recovery fee to Outerie.

Nor is there merit to the government's argument that the records were admissible as

We therefore elect to remand on this issue to the district court in accordance with the procedures of United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994).  On remand, the court is directed to consider explicitly whether a conspiracy between Benedict and Persing existed, and, if it finds that one did, to explain the evidentiary foundations for its finding.  If the court concludes that it cannot find that the conspiracy in question existed, it should vacate the convictions on Counts 4, 5, and 6 (extortionate collection of credit and extortionate collection of credit conspiracy with respect to Harley Beckerman and Stephen Arcoleo).  Either party may restore jurisdiction to this Court to consider whatever arguments remain or arise relating to the coconspirator statements by sending a letter to the Clerk of Court within 14 days of the district court's decision.  Any such further proceedings will be assigned to this panel.

## CONCLUSION

For the foregoing reasons, the judgment of conviction is AFFIRMED in part and REMANDED in part.  The mandate shall issue forthwith.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

declarations against penal interest.  See Fed. R. Evid. 804(b)(3).  This exception requires that the declarant be "unavailable," that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability," and, in cases like this one, that the statement "is supported by corroborating circumstances that clearly indicate its trustworthiness."  Id.  The statements themselves must be self-inculpatory; it is not enough that they are "made within a broader narrative that is generally self-inculpatory."  Williamson v. United States, 512 U.S. 594, 600-01 (1994).  The government does not direct us to evidence that establishes those foundational facts.